We are now reporting. Hear ye, hear ye, this Honorable Appellate Court for the Second Judicial District is now in session. The Honorable Susan F. Hutchinson presiding. Your Honors, the second case on the docket this morning is 2-20-0599, Mill Creek Water Reclamation District, a body politic, Plaintiff Appellant Cross Appellee v. Kent W. Shodeen et al. Defendants Appellees Cross Appellants. Arguing for the Appellant, Mr. Michael L. Reeses. Arguing for the Cross Appellee, Ms. Ellen Green. Arguing for the Appellee, Mr. Adam N. Kirsch. Okay, I think I have it. All right. So we will begin. And Mr. Reeses, you may proceed. Thank you. Good morning, and may it please the court, counsel. My name is Michael Reeses, and I'm here this morning on behalf of the Appellant, Mill Creek Water Reclamation District. This appeal arises from judgments entered in a bench trial in two consolidated cases. I will argue as the Appellant against the judgment entered in Shodeen's favor in the 15-L case. My partner, Ellen Green, will argue for the district in the 14-MR case as the Cross Appellee and as conditional Appellant in the 14-MR case. In the 15-L case, we submit the trial court erred in entering judgment against the district on two grounds. First, the Shodeen plaintiffs were not entitled to judgment in the 15-L case when the trial court found in the 14-MR case that Shodeen had breached the 1995 purchase agreements. Those agreements provided for a complete land application system, including, quote, lands and easements necessary therefore, close quote. Those are key terms repeated three times in the purchase agreement and three times in the supporting bill of sale. The trial court found a material breach because Shodeen did not sell or convey the, quote, lands and easements, close quote, necessary to complete the system. Having found Mr. Reeses? Yes. When the actual district got the property in the six million plus dollar transaction, there was also a lease entered into, correct? Correct. And didn't that lease define Shodeen or one of his entities as the owner of that irrigation discharge property? That may well have been, Your Honor, but remember that the purchase agreement indicated that the lease or the payments made under the lease were part of the consideration for the purchase price. What was the purpose of the lease? Well, it allowed the district to make payments to pay down the purchase price over the 15-year term. But if the district was supposed to convey a complete irrigation field, why would they also lease you one? Well, we were initially having to pay down the purchase price, okay, and during that time we were able to use the land for irrigation, but the expectation was that at some point they were going to deliver the necessary lands and easements to complete the system, and that should have occurred, we believe, at the end of the 15-year term. By that time, we would have paid close to two million dollars on top of the 6.4 million dollars, which was more than the 8.1 million dollars reflected in the purchase agreement. But that lease, as I looked at it and read it, only has extension provisions. It doesn't have any transfer of property provision at its end. Well, we have a bill of sale and the purchase certainly had the, you know, the bill of as well as the purchase agreement reflected a sale of the lands and the easements, okay, and as far as what you indicated for the extension, well, just remember something here. Back in 1995, no one knew whether this would be a successful development. Initially, the rent per year was only about 20,000 dollars. If the rent never went up because it wasn't selling and it well, presumably, the parties would have had to negotiate something further because there would not have been a pay down of that purchase price. The agreement indicates that 50 percent of the sewer rate charged to the residents of the district was to go to the defendants as rent, correct? 50 percent of the sewer rate, correct. Right, so this was easy to do until 2006 when the sewer rate was distinct from the water rate, correct? Absolutely, and that's one of our arguments for why we think that the Patsult's calculation of damages was speculative is because after 2006, of course, we didn't know what the rate was. So, when the district combined these two rates in 2006, did the district inform the defendants how much of the combined rate should be allocated to the sewer? I don't believe that that is in the record. I don't believe there's anything in the record to indicate what the rate. There was no further calculation made because, as we know, at the time of trial, Patsult was simply using the 47 to 53 ratio and then simply increased it in lockstep as the overall rate increased. And did the district object to how much it was being charged in rent prior to 2012? Well, absolutely. We were trying to work out some type of negotiation that would allow us to continue to use the land that we believe was promised to us at the time of purchase. So, there was simply a disagreement and we could not resolve it. I'm sure the parties did their best to resolve it, but we could not resolve it. That's why we wound up in litigation. Did your clients or any one of the individual entities, I'm sorry, did the show deans or any of the individual entities go to court after 2006 when the bills were combined to try to straighten anything out? No, they didn't file their own suit until 2015. And you have to remember, when we filed the suit in 2014, it wasn't just about whether or not we were entitled to the land or an easement over the land. It was also a challenge to other provisions of the purchase agreement that related to open-ended tap-on fees that we waived that wound up going into show deans' pocket or the annexation of the excess capacity. There were other issues as well. It wasn't just about discharge of water on the land that was the golf courses. That waiver of fees, tap-on fees, also had a purpose of paying back the defendants for the building, their outpouring of currency to put the district field in process. Yes, absolutely. And no one ever doubted, no one ever questioned that Mr. Shodin was entitled to make a profit. But there was nothing wrong in him making a profit. The wrong was in him charging rent on land that should have been part of the land application to keep the land application system functioning or, as I think it was argued and testified in the trial court, to keep the toilets flushing. Well, wouldn't this agreement, if the overflow distribution was allowed or the distribution area was allowed, shouldn't it have been not identified as an easement but as a particular space? Because I thought there were two golf courses that might have been subject to the release of the treated water. Well, there were two golf courses and I think they were about 173 acres. And I think either conveying the land or I think just an easement, the agreement did allow the Shodins just to give us a permanent easement, something we could have recorded, to preserve our ability to discharge water within our control. Because part of this is we never had control under the lease. Control was reserved to Shodin to maximize his profit on operating the golf courses. And going back to the trial court's finding, if it found in the 14-MR case that Shodin did not substantially perform, then it stands to reason that he also didn't substantially perform as required in the 15-L case. The two judgments are not consistent with each other. If he breached in the one case, he had a breach in the other case. The district paid for a complete system. Under the purchase agreement, it paid $6.4 million upfront. It paid $2 million or more under the payments made in the disposal lease. And Shodin received the benefit of our waiver of the tap-on fees that could have been up to $35 million. But because Shodin never delivered the land to go with the land application system, he was not entitled to charge us rent on land that should have been included in the land application system. You had been paying and he had been taking for at least six years at that point. Well, it would have been a little bit over two years, about two and a half years. Correct. And again, we had financial constraints. We had a disagreement. We had financial constraints. We couldn't just go out and buy new land for our disposal operations. And as a matter of fact, that was something that actually the time that was spent in trying to locate land and then building up the financial reserve to be able to go forward, that took time. So we negotiated extensions. We negotiated extensions. Yes. Does the record reflect what land or whose land you condemned, the district condemned, in order to, is this 25 acres that was referenced in the record? I don't believe it was 25 acres. I think it was land of a comparable size. And there was land that was, I think, adjoining the golf courses. But it took time in 2019, 2020, maybe 2021, to build up the infrastructure, the pipes to carry the water onto the new land. Well, Mr. Reese, the sign is up. If you want to summarize, I would appreciate it. Okay. Just to summarize, the judgment entering against the district in the 15L case should be reversed. He never conveyed the land to go with the land application system, and he didn't provide a reasonable basis for calculating damages for the reasons set forth in our brief. And for all the reasons, we ask you to reverse the judgment entered in Schrodinger's favor on count one in the 15L case. Thank you again for the time you've given us this morning. Thank you, sir. I have one quick question. Mr. Reese, you did not comment on the trial court's finding that the rule of necessity applied. Do you want to comment on that? I think the rule of necessity applies relative to the conditional appeal. I don't think it applies to the 15L case. I think it applied to the 14MR case. And I will yield to my partner, Ellen Green, on that question in her portion of the presentation. Thank you very much. Mr. Jostik, do you have any other questions? No. All right. Thank you, Mr. Reese. All right. I guess we go to Mr. Hirsch. Good morning, Your Honors. May it please the court. My name is Adam Hirsch, and I represent the Appellees slash Cross Appellants in this matter. My presentation to the court this morning is going to be split into two parts. I'm first going to respond to counsel's presentation on the district's affirmative appeal, and then I'm going to make our presentation as Cross Appellants in our matter. Off the bat, there are a couple of points. Let me ask a question that might get us moving. What was the purpose of that lease that was entered close to, if not at the same time, as the purchase agreement? The primary purpose, well, I would say there are two primary purposes, Your Honor. The first is that the payments contemplated under that lease comprised a portion of the purchase price paid by the district for the systems. That's expressly in the purchase price term in that agreement. It says that the out-of-pocket $6.455 million number is less than the cost of construction. To fill that gap, we are going to agree to this lease. Then the other piece of that, of course, was the assignment of excess capacity. The second purpose of the lease was to ensure that the district's systems were complete from day one, and that they had a lease right, a tenant's right, to deposit their wastewater on the land covered by the lease. That's exactly what happened. Why was your client, or I guess it was maybe the Mill Creek, one of the defendants or respondents here, why were they maintained in that lease as owner? Well, because that was not land that was transferred to the district. In 1995, when these agreements were signed, there was a contemplated possibility of two 18-hole golf courses, but only nine holes were built. Nobody knew, as counsel said, how fast Mill Creek might grow, how fast it might be developed or filled in. That land was reserved for irrigation, and then the market was going to do its job one way or the other. If it filled in, if there became demand for golf, which is what happened, the golf courses would get built out, the residential parcels got built out. It was a way for the district to obtain the systems up front, but with the risk of what was going to happen in the future to fall entirely on my clients. They made the bet in 1995, and if the PUD failed, the district wouldn't be out anything. My clients would have been out. That land was posted, as I believe, as collateral for the bonds that were part of the construction process, and so it was a way to allocate risk. Was there any provision in that lease for anything other than extension of the lease? In other words, was there a provision that there would be a transfer, an additional transfer of that property to the district? Absolutely not, Your Honor. In fact, the only other provision I think that bears on this conversation is the cancellation right was unilateral to the benefit of the district. In other words, the district wasn't locked in for the initial 15-year term. They had the right, though my clients did not, to cancel the lease on one year's notice if they were able to find other land to go to make a deal with an adjoining district, start condemnation proceedings or what have you. They could get out on a year's notice. My client, conversely, was locked in for 15-year term if that's where the district wanted to put the water. The other point from counsel that I wanted to address just off the top is that he argued that the district had an expectation that this irrigation field would be delivered to them. That does not match the record which shows that the district was silent on the supposed contractual obligation for 24 years. It was silent on this supposed conveyance obligation for the duration of the lease, for six years of litigation, and during a four-day trial. It was only 11 days after the trial that the district moved for leave to amend to add a claim for breach of the purchase agreement for failure to convey this land. If that was their expectation, 24 years of silence is not, I would say, a very effective way of showing it. What easements then were conveyed in the purchase agreement? There was land conveyed in the purchase agreement, Your Honor. That was a defined term, capital L, in that document. In paragraph one, it's conveyed. That was a specified 24.939 acres of land that was the land under the facilities in this water reclamation system. I believe it was potentially a retention pond. It was land a permit to and necessary for the pieces of the system that would be a title survey, for which there was insurance, and that was specifically defined and conveyed in that agreement. That was what was conveyed. Does the agreement say you were supposed to convey the irrigation field? Absolutely not, Your Honor. If the plain language of the agreement supports your argument, do we need to consider any of your affirmative defenses? You do not, Your Honor. Obviously, we have the procedural argument in front of the substantive argument that leave to amend shouldn't have been granted, but if that issue is put to the side, then you're absolutely correct that if the plain language of the agreement reads the way we argue what reads in our brief, then the affirmative defenses do not need to be breached. Mr. Hirsch, the other argument that Mr. Reiss has made, but because of time was not able to expand on, is that if the purpose of this lease agreement was to help defray some of the purchase price and pay back some of that name purchase price, but you were still getting waiver on tap ponds, how much did you want to get repaid? Well, we wanted to get paid commensurate with the expenditure on infrastructure and with the risk that was taken, and so the expenditure on infrastructure over the life of Mill Creek, as the circuit court found, was more than approximately four times that initial $6.4 million number that the Shodine enemies put in, over $20 million in expanding and building a new well and building out the systems to meet the community, and so there was that expenditure, all of which got conveyed to the district. It was in the record of trial that the last set of audited financials that the district had, it valued the systems at $16 million after depreciation. But you were getting, your clients were getting those tap on waivers and collecting those fees themselves, and who knows if put additional money into additional fees for tap on into the purchase price of the home, and that's not relevant right now, but what is it, $15,500, something like that for tap on fees, they've been collecting those for several years. Not at that rate, Your Honor, what the record showed, and I don't have the record side at easy reach, but we tendered as a trial exhibit the full list of tap on fees paid by parcel, and so that $15,500 number was an accelerated number that was used only until the initial construction bonds were retired. After the construction bonds were retired, the tap on fees charged to residences was far less. I don't the extrapolative math that the district does is just not supported by the record. And how was that, the newer tap on fee determined, was that an agreement in writing between the district and Schrodinger? I don't think that's in the record, Your Honor. I don't believe there was a document in writing, although certainly there was an exchange of information, so there was no surprise, there was nothing hidden in terms of the tap ons being charged. And when your clients, all right, nevermind, you can proceed. Thank you, Your Honor. So just the last point that counsel made that I want to just touch on briefly is that he referred to the bill of sale in support of his position that real property should have been conveyed as a part of these agreements. Bill of sale is for chattel or personal property. This particular bill of sale refers to, quote, the following described personal property. So we don't think the bill of sale is of any way for value in supporting the district's position. If I can move to our procedural argument, Your Honors, I want to discuss the post-trial decision to grant the district leave to amend its complaint to add count 11 after trial. This decision prejudiced my clients in every possible way that they could have been prejudiced. But the court has great discretion in allowing an amendment throughout a proceeding, correct? It does. It's an abusive discretion as well, yes. Then I assume that right now you're going to tell us how your client was prejudiced. I am, Your Honor, yes, in multiple ways, substantive and procedural. We've discussed some of the substance in terms of the contracted defenses and evidence that my client was unable to put on in response to this case. This amendment came post-trial. The case law is very clear that if a plaintiff seeks leave to amend to add a claim after the trial is done, they need to have a good reason for having waited. The district here has no reason. They offered none below. They have not offered one in the briefs submitted to this court. The prejudice also at the procedural point was that the claim asserted was entirely inconsistent with the claims presented at trial. Did your client, did you move to reopen the proofs? We asked for that in our 1203 motion, Your Honor, yes. And the circuit court said that request was timely, even though it came in the 1203 motion, there was no sort of waiver of that position on our part. And it said, in effect, well, let's see what happens on appeal. We might not need to get there. And so I believe that the circuit court is a matter of what we call in our brief practical case management said, well, I'm not going to do that now. Let's see what happens. But yes, we did ask for that. We asked for both discovery and a retrial. And the discovery part of that goes to a couple of points. One is that had the district made this demand in a timely fashion following the execution of these agreements in 1995, my client had significant undeveloped land within this district that it could have conveyed. If we lost this fight in 1995, there was a specific performance remedy available to the district. As the Mill Creek developed and the golf courses and all the residences were built out, that land is no longer available for conveyance. So the delay there is prejudicial. It deprived my clients of a remedy. It also baked in 24 years of real estate appreciation for the district on its damages. And one of our arguments was we were not able to present at trial what the 1995 value of that land was. The circuit court granted, based on papers only, entered a judgment of over 2.6 million dollars based on a 2020 real estate transaction. And our inability to make a record contrary to that, to challenge that number, is part of the prejudice from the circuit court's decision. The other pieces of evidence I think we would have put on where the prejudice affected us would have been in, well, what did they really need? The record of trial was that there was a 170 acres over the golf courses that were being irrigated. They went on and condemned the same amount of land. It's now, at this point, used entirely for irrigation. But from our perspective, it stands to reason if they needed 170 acres of golf courses, they would need far fewer acres if it was 100 percent dedicated to irrigation. So the piece of land that they took, we would argue, is too large and therefore the damages number is much higher than it otherwise might have been. The list keeps going. The contract says, well, maybe it could have been an easement. We would have built a record, I think, complete with expert witnesses, as to what an easement might have looked like and what that cost might have been. And so we think, again, as I said a and on the plain language of the contract, we shouldn't have to get there. But if we get there, the procedural prejudice to my clients was substantial. That prejudice comes into play, in addition, in our affirmative defenses. And the two I would focus the court on are election of remedies and latches. And so the election of remedies here, I think we've that because the district went to trial on injunctive claims only seeking to invalidate these agreements in their entirety. That's their choice. And once that got through the trial, and certainly once a favorable judgment was entered for the district on those claims, it cannot show up 11 days after the groups are closed and say, hey, I want to affirm this sort of prejudice and this sort of inconsistency. Now, this isn't an inconsistency that's based in fact. It's not a case where somebody is arguing, well, I've got an oral agreement. And if the court doesn't find that, I've got promissory estoppel. This is legal inconsistency on the same facts. And that legal inconsistency means they had to make a choice. And they had to make a choice when they went to trial. And they made that choice. And that choice works under the cases we cited as an estoppel against them asserting count 11 and seeking damages. The latches argument is very similar. And the delay and prejudice we submit are crystal clear on this record that if they are right in the contractual duty that undergirds their count 11, that breach happened in 1995. Not only did they do nothing or say nothing as to that obligation until after trial at the end of 2019, they performed under the lease. They paid not just 15 years of rent. They made four lease extensions extended by new and undisputedly independent trustees in which the lease obligation was separately ratified each time. All of that payment, all of the infrastructure that we discussed that my clients built in the intervening decades, that's all reliance on affirmative actions by the government that prejudiced my clients. My clients acted on the assumption and on the premise that the district would honor these agreements rather than sue to have them invalidated. Let's talk about the interest. There's ample case law that provides a court may not award interest against the state if the effect of that order is to enter a money judgment against the state. If the trial court were to have awarded you pre-judgment interest, would that not have been an improper judgment? Well, we think it would have been a proper response to a persuasive argument to extend or amend the law, Your Honor. The prohibition against interest against a governmental entity does not appear on the face of the Interest Act, the judicial construction of it. I would make two points. One is the concept of interest as a penalty against the government comes from the northern district's Pennwater case. That case concerns a government going out after money it when it is trying to fulfill a governmental obligation as a penalty on the government acting as it should. Here, this is really more like a private contract, and we make this argument in our statute of limitations section. This is a business deal, and the sanitary district was authorized to do it, and under the Sanitary District Act, it's what it was supposed to do. But at the same time, in 2012, when the parties were negotiating at the expiration of the lease, one of their trustees admitted, well, we're going to stop paying rent as a negotiation tactic, which you would expect from a sharp-edged private actor. That decision has carried through now more than a decade of litigation, and if interest is not awarded, if that time value cannot be captured by my clients, then those sort of patents are going to be rewarded, and there's lots of case in different contexts that says when the government acts like a pirate, it gets treated like one. And as this court said in the Hasseby-Cravada case, in our society, the use of money is worth money, and there's not really a basis for that principle to not apply to the district in this case. Well, if there is some question, and I think there is based upon the conversation here, that the amount of fees that were being paid under that lease were assumed, how could a court actually order prejudgment interest? Well, I think that goes back to the proper measure of damages for a holdover tenancy. The money judgment on which we're seeking interest is the holdover rent for the period from 2012 to 2019. But that amount that's actually been paid, I think the argument was, is assumed to be accurate, and that's not a good way to determine damages by assuming, by splitting it, or 47-53, or something like that. Well, I think I would push back a little bit, Your Honor, that that was an assumption. As was said in the prior presentation, that's what the district agreed to in 05-06-07. So it was an assumption made by Mr. Patzelt, certainly his testimony explained why and where it came from, but then it was invoiced to the district. So it's not so much an assumption, we would say it's course of conduct. And certainly the party's course of conduct is very good evidence as to what the agreement means and how damage should be calculated going forward. This was not a hypothetical, this was not a higher gun litigation damages expert doing a future profits projection. This was Mr. Patzelt contemporaneously invoicing the district, getting those payments, and then when the dispute arose, in tracking that same division and that same payment basis through the duration of the relationship of the trial. And if you'd like to sum up your position on this particular aspect of the case? I think the sum I would remind the court, I guess, of the standard of review for this damages calculation, which is it must be against the manifest weight of the evidence in a bench trial. And certainly we understand the district disagrees with the damages calculation. They put in an alternative version of this formula that spit out a $1.8 million number, and the circuit judge heard the evidence, listened to the witnesses, looked at the documents, and came up with a damages number that was more than theirs and less than ours. And there's just not any basis in the record or any basis in the district's case for that finding to be against the manifest weight. All right. So Mr. Rees, is this where you'd like your minute or two to make? Yes, I'll take it now very briefly, Your Honor. Three points. Okay. Point number one, opposing counsel says that we first raised the issue of material breach and substantial performance 11 days after trial. I think I heard that twice. In the 15L case, we raised the issue in paragraphs 22, 34, and 37 of our answer. It wasn't for the first time in the 15L case after trial. It was well before trial, the statement of the record. Second point, counsel references the bill of sale. The bill of sale, although it talks about personal property, it identifies three systems, a complete drainage system, a complete wastewater work system, a complete water work system. Each time it includes lands and easements necessary therefore. Strangely enough, I never really heard from them as to what that last phrase mentioned three times in the purchase agreement, three times in the bill of sale. What was it referring to if not all of the land necessary for a complete system? Third point. Just let me ask a question. The system is going to work. It's going to do its job without a specific point of irrigation or distribution, won't it? We need the land. We need the land to conduct the dispersal of the treated water. Now, it can be through an easement. The agreement referenced an easement as well as the lands. And there was a conveyance of 25 acres and then necessary easements. Isn't that an appropriate interpretation of the contract? No, it is not, Justice Burkett. And what's our standard of review with respect to contract interpretation? Well, it's de novo. However, although it's de novo, the court here was making its determination after hearing the witnesses, determining the breach in the 14-MR case and what should have been the breach in the 15-L case. But to get to your point, the 25 acres references to the physical plant, all right? That's not where the discharge occurs. The discharge occurs at the other end of the pipes. And that has to be on some other property than the 25 acres. We needed a lot more than 25 acres when we had up to now 2,300 single-family homes. So it's not the 25 acres that were identified as an Exhibit A to the purchase agreement. Couldn't be. Third point, this whole idea about what the sewer rate was in terms of the calculation of what their claim for damages was. He was using one year for the ratio, 47 to 53, for the last year when both rates were known, in 2005. And then all he did after 2005 was he assumed the same ratio for the next 14 years. And if I could sum up that case, makes it clear that you can't base a calculation of damages or in that case profits when it goes contrary to the known facts. And using 14 years at a fixed 47 to 53 lockstep ratio to calculate damages was improper. One last point about Fowler. Fowler was not a damage witness. Fowler was simply demonstrating the manipulation of their damage calculation by using what was also a number that was not tied to the fair market rental value of irrigated land. He was using $2.50 throughout, whereas Patsell kept the lockstep ratio going for 14 years. But neither number actually reflected the fair market rental value. And without that, it was speculation, conjecture, and guesswork. And even a remitter would have been improper on this record. Again, I want to thank the court for its time this morning and the patience it has shown. And for all the reasons in the appeal of the 15L case, we ask you to reverse the judgment Thank you. Justice Burkett, do you have anything else to add? No. Thank you, Mr. Reeses. And Justice Shostak, anything else? No, nothing. And you're sure Mia doesn't have anything either? That I got off of the computer, not just on my phone because I couldn't hear her. That last time she barked, I think it sort of stunned Mr. Reeses. All right. Now we will go to Ms. Green for reply and cross-appeal. Good morning. May it please the court. I'm Ellen Green. I'm here as the cross-appellee on the 14MR1234 case on the count 11 for breach of you. Why is the rule of necessity applicable to this case? And if it's not applicable here, what facts would then it ever be applicable to? The rule of necessity that relates to our conditional cross-appeal, which this court does not need to address if it affirms on count 11, because count 11 is the legal remedy we sought. The conditional cross-appeal relates to the equitable remedies, like getting money back for unjust enrichment. And they are based on violations of COPA and this Sanitary District Act, both of which prohibit an official from having a financial interest in a contract that they're going to enter into. The rule of necessity had to do with the drawing of the district. At the time they said, well, there has to be, we had to pick our relatives and employees because there are only maybe eight eligible people. There was no one there at the time. Right. But that was one of the reasons is that's the way they decided to draw it. But the rule of necessity, we argue under the case law has to do with adjudications. Let's say there has to be, a judge has to hear a case because that's the only form you have available. So we don't think it's even applies just saying, well, we had to have draw the map this way, or we had to use our relatives to enter into these, what we consider oppressive contracts for the district. And then even if we were left with these. Let me just ask a question. Yes. You said these oppressive contracts in our consideration. I mean, King County, for better, for worse, has had several issues with waste water reclamation areas. And they decided in this case that it wouldn't be private. Your subdivision could go in, but, or Chaudine's could go in, but it couldn't be a private water source. It would have to be a public water source. They needed to appoint the first people to be on because, and they should have standing. And that would mean they live somewhere within that area. So why is it oppressive? Oh, when I say oppressive, it's the, it's not just the having them on there. And it's the powers that were granted to the defendants in these agreements, like they were allowed to petition the district to annex property into the district. And the way the agreements worded, it says the district shall annex the property. So it's really giving certain powers to private individuals in what should be within the realm of the district's power under the Sanitary District Act. So it's not just about not getting a complete system, having a place to put the water, but it was these other powers that the trial court found were unconscionable and against public policy. And, you know, it's interesting that the defendants don't appeal those rulings. So part of the, you know, they did find that part of these agreements were unconscionable. So that's, you know, when we say oppressive, it was just beyond a developer wanting to make a profit. And, you know, we understand, you know, they can get tap on fees, we can pay off the only could be within the boundaries as contemplated at the time the agreements were entered into. So if the court found that if they annexed into contiguous properties, they were no longer able to get tap on fees. And what, you know, distinguishes this case from other cases, I think there's Fiala and some other cases, perhaps. But here, there was no limits in time or scope. And, you know, it went on for perpetuity. And it also, you know, as the size of the district increased. So what the trial court did here is, you know, attempt to put some reasonable limits on it. In the first 10 pounds of your complaint, you suggest that the 1995 trustees were incredibly biased and entered in agreements should be voided because it was so unfair to the district. That was in count 10, or the first 10 counts in count 11. Yes, that the 1995 trustees negotiated incredible deal for the district, they got them their own irrigation field, which is it were the trustees incredibly bias, or were they incredibly shrewd in getting a deal for the district? Well, it's a little bit of both, because they are purchasing, they are getting a system, a complete system. I wouldn't necessarily say it's a great deal. But, you know, we're saying it's a fair deal. We paid for this the eight point something million dollars. And then that's what we should get. And then that's not inconsistent with some of the injunctive or declaratory relief that we saw that really had to do with the district's powers that belong to the district as a public entity on behalf of the residents of Mill Creek. And it shouldn't be in the hands of the developer. So there's a little bit of both. And I think by the time we had the second amended complaint that you know, at trial of the remaining counts, count two, I believe asked for, you know, as one option is, you know, allowing the district to discharge its water onto the golf course properties for free. You know, it didn't, you know, it wasn't prescribed what that had to be. But that was something they objected to, you know, the district waits so long to seek to amend its file count 11. Because this was never, you know, in retrospect, we could say, yeah, maybe we should have brought it earlier. But this wasn't about collecting money. It was about having a complete system, having the powers in the district. So it wouldn't have been enough just to go out and, and seek to recover compensatory damages. That's not what they were looking for. They weren't looking for money, they were looking for their powers and just a place to put water. And that would look like you were trying to conform your the district's pleadings to the defendant's proofs. Why so late? Well, that's it also corresponds to the proofs, it didn't have to correspond to the proofs because judgment had not been entered. And it's important that there to mention that there's a 10 month gap between the time that we asked for leave to amend the complaint. And the time that they asked to reopen discovery, they didn't ask to reopen discovery until after judgment was entered. They still had four months from the at that time, they could have said, oh, you gave them leave to amend to add a breach of contract claim, maybe we should have some discovery. But instead, they waited till after judgment was entered four months later, when is when they made the request, which really makes you question, did they really need that discovery? Or did they think, oh, this would be a great appealable issue not to, you know, you know, it suggests they had ulterior motives. But you know, it's just not reasonable to say, oh, we're so prejudiced, so prejudiced, they never even thought about it. And even in one of their briefs, I mentioned, oh, you knew about this as far back as 2018, because somebody testified, well, you didn't get a complete system. And they said, well, you should have thought about a breach of contract then claim then. Well, if that's the case, they should have also anticipated the possibility of a breach of contract claim. So I think their claims of prejudice really ring hollow under the circumstances here. The other thing is, you know, this is abusive discretion standard. And this is brought under to 616. A, which, you know, they because it's before judgment, they still hadn't had closing arguments. And the question really does this further the ends of justice. And that's what trial court determined that this would further the ends of just just justice to allow this amendment and allow us to recoup the money to purchase land to have the complete system that we should have gotten under the original agreement. And thank you much. But if the court has no further questions, we'd ask the court to affirm the judgment in the district's favor on count 11. And also from the denial of the prejudgment interest in the 15 l 293 case, as it does not apply to a governmental entity under the case. Okay, and Mr. Hirsch, do we have any? Are you entitled at this point? I've lost track of who's I think I'm six, five minutes, Your Honor. That's fine. Okay. I will endeavor to edit myself into that window. Let me respond to Mr. Reese's couple of points first, and then I'll respond to Miss Green. Mr. Reese's talked again on the phrase complete lands and systems. I want to make clear that the record was undisputed that these systems were complete and worked from day one. And that completeness and their functionality has not changed in the intervening 20 plus years. They were always complete. They were permitted by the IEPA as complete in the phrase we've heard today, the toilets have always flushed. So the question here then is only what do these agreements say, which we went through? And alternatively, what is the Sanitary District Act have to say? Section eight of the Sanitary District Act expressly permits a sanitary district to procure its systems by lease. The district has not addressed that language as far as I remember in any of their briefs. It's perfectly ordinary and appropriate for the acquisition here to be the conveyance of the channels and items conveyed via the bill of sale, working in conjunction with the lease that provided the district with the irrigation rights on defendant's land. Let me switch. I'm sorry. Well, I was going to say how you had to get what's the channel on the land that gets to the gets the pipes? Is it the pipes to the sprinkler? It's correct, Your Honor. Okay. Let me turn to the Loyola analysis on the motion for leave to amend. Council spent a lot of time on that. Again, I still have not heard a reason why they waited other than my understanding was they didn't want money until they made a claim that demanded money which I don't think is particularly persuasive. The formulation I heard from council to me shows why election of remedies has force here because they elected. It's really what she said. They elected to try and void these contracts. The overwhelming majority of their presentation was on these conflict of interests claims of attempting to rebut the necessity defense. That was the core of this case. By the time it got to trial, that was all that was left. They elected to go that way, to not put in damages claim, not put in damages experts. This idea that my clients should have been able to deduce that this claim existed from some research. How do you respond to their argument that you waited a year to ask for discovery? Well, we didn't. It wasn't a year, Your Honor. It was four months. The motion for leave came post-trial in December of 19. We briefed it through the beginning of 2020. Our arguments against granting leave included the arguments that we were prejudiced because there had not been discovery and there would not be a trial on these issues. In June, the circuit court granted leave over those objections. At that point, it felt redundant. When the final judgment came down, we felt the need to make that argument again in the 1203 motion, but we had presented the prejudice to us under the Loyola analysis for a lack of discovery, for a lack of adversarial trial presentation on these issues, and the circuit court went against us. We did not make a specific motion for leave to reopen discovery, but those issues were briefed and in our view had been decided upon by the circuit court that we were prejudiced. Just a couple of other real quick factual points. One, on this, the counsel said that under count two, one of the pieces of relief requested was the privilege to deposit wastewater on defendant's land for free. That was the subject of our successful motion to strike. So that was not an issue of trial. That was not something they could ask for or gotten. They were trying again under POPA to wipe these contracts out entirely. We directed the court in our brief to the headings in their post-trial briefs, which we think as clearly as anything else, show what they were after a trial, which was not money damages. I see that my time is up if there are no more questions from the court. Thank you. Justice Burkett. No, thank you. No, thanks. Well, counsel, thank you very much. I feel like I have become the queen of sanitary districts and I'm beginning to think that there's a problem with that title. But the arguments were instructive, they were helpful, and we will issue a decision in due course. You are now excused. Thank you. Thank you. Thank you, your honors. Thank you.